**STECKLER GRESHAM COCHRAN PLLC**
Bruce W. Steckler
New York Bar No.: 4863395
L. Kirstine Rogers (*to be admitted PHV*)
Texas Bar No. 24033009
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
Phone: (972) 387-4040
Fax: (972) 387-4041
Email: bruce@sgc.law
Email: krogers@sgc.law

*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDREA FRANKIEWICZ and RUTH PEREZ, Individually and on Behalf of a Class of Similarly Situated Individuals, | CASE NO. 1:20-cv-5157 |
| *Plaintiffs,* | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| MANHATTAN CRYOBANK, INC. and CNTP MCB, INC., | |
| *Defendants.* | |

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW, Andrea Frankiewicz and Ruth Perez, individually and on behalf of a class of similarly situated individuals, ("Plaintiffs") by their undersigned attorney, and file this Original Class Action Complaint against Manhattan Cryobank, Inc. and CNTP MCB Inc. (collectively, "Defendants"), and allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through their attorney.

## I.    <u>NOTICE OF PRIOR RELATED CASE</u>

1.    Pursuant to Local Rule 1.6, Plaintiffs' counsel advises the Court of a related case that was previously filed and voluntarily dismissed to pursue the claims in arbitration.

2.    Plaintiffs initially filed a similar case on May 10, 2019 against Manhattan Cryobank, Inc. ("MCB") and its related entities, LifePrint Group, Inc., CN Genetic Partners LLC, CCB-MCB, LLC, and CNTP MCB Inc., Case No. 1:19-cv-04258, in the United States District Court for the Southern District of New York (hereinafter referred to as "*Frankiewicz 1*").

3.    CN Genetics Partners LLC is believed to be the parent company of Manhattan Cryobank, Inc. which is now known at CNTP MCB, Inc.  LifePrint Group, Inc. is a dissolved corporation.  According to CCB-MCB LLC, it acquired the assets of Manhattan Cyrobank, Inc., but not its liabilities on July 27, 2018.

4.    According to NYS Department of State, Division of Corporations, records, Manhattan Cryobank, Inc. changed its entity name to CNTP MCB Inc. on August 7, 2018.

5.    Plaintiffs successfully served all defendants in that action.  See Dkt. Nos. 15, 16, 17, and 20 in *Frankiewicz 1*.

6.    On July 15, 2019, defendant CCB-MCB LLC appeared in *Frankiewicz 1* and moved to dismiss and compel arbitration of the matter based on an arbitration provision in the contract between Plaintiffs and Manhattan Cryobank, Inc.  *See* Dkt. No. 29 in *Frankiewicz 1*. According to CCB-MCB LLC, it acquired Manhattan Cryobank's contracts with Plaintiffs and the putative class as part of the asset purchase agreement in 2018.

7.    Given defendant CCB-MCB LLC's motion to compel arbitration, on July 23, 2019, Plaintiffs filed a demand for arbitration with JAMS against Manhattan Cryobank, Inc., CCB-MCB LLC, and CNTP MCB Inc.

8. Plaintiffs provided JAMS with all parties' known contact information in the demand for arbitration and the known email addresses for representatives of all parties.

9. Under the arbitration provision invoked by CCB-MCB LLC, the arbitration was to be governed by then current rules of JAMS.

10. On July 24, 2019, to ensure prompt notice of the demand, Plaintiffs' counsel also served the demand for arbitration via Federal Express on known counsel, registered agents, or representatives of Manhattan Cryobank, Inc., CCB-MCB LLC, and CNTP MCB, Inc.

11. On July 24, 2019, Plaintiffs voluntarily dismissed *Frankiewicz 1* in order for the claims to proceed in arbitration with JAMS. See Dkt. No. 35 in *Frankiewicz 1*.

12. CCB-MCB LLC appeared in the arbitration, and, on August 7, 2019, JAMS issued a Commencement of Consumer Arbitration with JAMS reference number: 1425030374.

13. On September 5, 2019, JAMS appointed the Honorable Michael D. Young to serve as Arbitrator.

14. Under the applicable JAMS rules, each party was required to pay its pro rata share of JAMS fees and expenses and the non-payment of fees may result in administrative suspension of the case.

15. In accordance with the applicable JAMS rules, both Plaintiffs and CCB-MCB LLC paid the required fees.

16. On September 27, 2019, JAMS notified counsel for Plaintiffs and CCB-MCB LLC that there were two outstanding invoices for the matter and that JAMS could not proceed until all retainers were paid. That email was also sent to the following email addresses: attorneycabungcal@amerilawyer.com; info@ManhattanCryoBank.com.

17.     On December 12, 2019, after inquiry from Plaintiffs' counsel regarding the arbitration, JAMS again notified the parties that JAMS was still missing payment of retainers from respondents Manhattan Cryobank, Inc. and CNTP MCB Inc. and that no conference call could be scheduled until all retainers were paid.  This email was again sent to the following email addresses: attorneycabungcal@amerilawyer.com; info@ManhattanCryoBank.com.

18.     On December 18, 2019, after further inquiry from Plaintiffs' counsel, JAMS confirmed that Manhattan Cryobank, Inc. and CNTP MCB Inc. had been served in the arbitration but that no counsel had appeared.  This email was again sent to the following email addresses: attorneycabungcal@amerilawyer.com; info@ManhattanCryoBank.com.

19.     Despite the numerous emails sent about their failure to pay the required fees and service of the demand in accordance with the JAMS rules, Defendants Manhattan Cryobank, Inc. and CNTP MCB Inc. did not appear in the arbitration.

20.     To ensure that Defendants' failure to appear in the arbitration and pay the required fees was not inadvertent, counsel for Plaintiffs again served the registered agents for Defendants Manhattan Cryobank, Inc. and CNTP MCB Inc. *via* private process server on January 10, 2020 in an abundance of caution.  Included in that service was a letter to Defendants' registered agent stating as follows:

> According to our records, you were served with the Demand for Arbitration but despite numerous efforts by JAMS, neither Manhattan Cryobank, Inc. nor CNTP MCB, Inc. have appeared in the arbitration or paid the necessary fees.  Out of an abundance of caution, we are again serving the Demand for Arbitration on the Registered Agents listed on the New York Secretary of State's website to give Manhattan Cryobank, Inc. and CNTP MCB, Inc. the opportunity to proceed in the arbitral forum.

21.     Defendants Manhattan Cryobank, Inc. and CNTP MCB Inc. did not respond.

22.    On May 12, 2020, after inquiry from Plaintiffs' counsel regarding the status of Defendants' appearance in the arbitration, JAMS stated that Manhattan Cryobank and CNTP MCB, LLC had still not been paid.  This email was again sent to the following email addresses: attorneycabungcal@amerilawyer.com; info@ManhattanCryoBank.com.   Nothing has occurred in the arbitration since that date.

23.    To date, Defendants Manhattan Cryobank, Inc. and CNTP MCB Inc. have still not appeared in the arbitration and have failed to pay any of the required fees.   Defendants Manhattan Cryobank, Inc. and CNTP MCB, Inc. have not made any objection to the demand for arbitration, its service, or any of the correspondence sent by JAMS or counsel for Plaintiffs regarding the arbitration proceedings.

24.    By refusing to appear and pay the JAMS fees, Defendants Manhattan Cryobank, Inc. and CNTP MCB Inc. have thwarted the purpose of such an arbitration provision which is to provide a cost effective and efficient means of resolving a claim.

25.    Defendants' refusal to appear and pay the fees required by JAMS constitutes a material breach of the arbitration provision, and Defendants' conduct defeats the purpose of the arbitration provision.  As such, Defendants have lost their right to compel Plaintiffs to arbitrate their claims.

26.    Defendants' conduct has interfered with Plaintiffs' right to have this dispute adjudicated and unreasonably held Plaintiffs at the mercy of Defendants Manhattan Cryobank, Inc. and CNTP MCB Inc.  Defendants' failure to appear in the arbitration or pay the required fees evidences a deliberate strategy unilaterally designed to delay the arbitration proceedings, and Plaintiffs have been prejudiced accordingly.

27. Upon the filing of this action, Plaintiffs intend on notifying JAMS of their intention to dismiss Manhattan Cryobank, Inc. and CNTP MCB Inc. in the arbitration in light of their failure to participate or appear in the arbitration or otherwise comply with the applicable JAMS rules and procedures.

## II.    INTRODUCTION

28. For years, Defendant Manhattan Cryobank, Inc. ("MCB") sold sperm to the public which it knew could contain genetic diseases. Worse, MCB's own chairman of the board recognized the inadequacies of MCB's genetic testing regimen and touted the benefits of a more robust screening technology. Nonetheless, MCB, despite having access to such technology, chose not to use it on sperm donated prior to November 1, 2014, despite agreeing and warranting to its customers that it performed a "complete and thorough screening" for genetic diseases.

29. Defendant MCB's screening was neither complete nor thorough. The allegations set forth below present a clear and present danger to members of the public using sperm purchased from MCB that was donated prior to November 1, 2014 and may contain life threatening and deadly genetic diseases.

## III.    PARTIES

30. Plaintiff Andrea Frankiewicz is a citizen and resident of Pennsylvania.

31. Plaintiff Ruth Perez is a citizen and resident of Pennsylvania.

32. Defendant Manhattan Cryobank, Inc. is a New York corporation with its principal place of business located in New York, New York.

33. Defendant CNTP MCB, Inc. is a domestic New York corporation doing business within the State of New York. Defendant CNTP MCB, Inc.'s principal place of business is located in New York, New York. On August 7, 2018, Defendant CNTP MCB, Inc. replaced

Defendant Manhattan Cryobank, Inc. and its new principal place of business listed with the New York Secretary of State is 211 E. 43rd Street, Suite 1701, New York, New York 10017.

## IV.    <u>JURISDICTION</u>

34.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because at least one member of the proposed Class is a citizen of a different state than Defendants, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and the proposed Class consists of more than 100 putative Class members.  Although Defendants are located in New York, the principal injuries resulting from Defendants' conduct alleged herein has been incurred throughout the United States where Class members are located.   On information and belief, greater than two-thirds of the members of the proposed Class are citizens of states other than New York.

35.    This Court has general personal jurisdiction over Defendants because Defendants maintain their principal places of business in the Southern District of New York and Defendants engage in continuous and systematic activities within the State of New York.

36.    Venue is proper in this District pursuant to 28 U.S.C. § 1391.  Specifically, as provided by 28 U.S.C. § 1391(c), Defendants are corporations that are deemed to reside in this District.  Moreover, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## V.    <u>FACTUAL ALLEGATIONS</u>

37.    MCB is in the commercial business of obtaining, screening, marketing, and selling sperm to consumers throughout the United States.

38.     MCB claims on its website to be a "leading sperm bank with a large and diverse selection of rigorously screened sperm donors."[1]

39.     MCB has been in business since approximately 2006 and currently sells sperm samples collected from donors as early as November 2007 until the present.

40.     Genetic screening of donor sperm is a key component of the services provided by MCB to consumers.  As one peer-reviewed publication explained regarding the importance of genetic screening to the consumer, "[t]he opportunity to minimize a future child's risk of disease, and the value placed on it by the reproductive marketplace, is reflected in the marketing claims of commercial sperm banks, which emphasize the rigor of donor screening protocols.  In addition to a three-generation family history analysis (a protocol whose primary utility is the surfacing of risk for dominant and X-linked conditions), all sperm banks perform some degree of carrier screening in their applicant selection process (*Sims et al.*, 2010).  Donor applicants who test positive for a disease-associated mutation are typically disqualified."[2]

41.     MCB sold sperm to Plaintiffs and the putative class pursuant to a standardized contract of adhesion entitled "Agreement for Purchase of Donor Sperm."

42.     In its Agreement for Purchase of Donor Sperm, MCB agreed and warranted to Plaintiffs and the putative class as follows:

> *Manhattan Cryobank acknowledges that they have performed a complete and thorough screening of the donor(s) for inheritable birth defects, inheritable serious illnesses that could be fatal, life threatening, or could result in permanent impairment of a body function or permanent damage to a body structure and for infectious diseases and, further, that they have found no evidence of such inheritable birth defects, serious illness or infectious diseases in the donor(s) whose semen will be used in the Recipient's reproductive procedure.*

---

[1] https://www.manhattancryobank.com/passion-for-personalized-service/ (last visited on January 24, 2019).
[2] See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4892196/ (last visited on January 23, 2019).

43.     Since its inception and licensure as a tissue bank, MCB has represented to the public and the government that it screens its donors for certain genetic diseases.

44.     On its website, MCB represented that it performs a "rigorous screening process" with extensive, accurate, and thorough genetic testing on its donors and that MCB continually reassessed the health status of the donors.

**MCB'S 2014 CHANGE TO MORE ROBUST GENETIC SCREENING**

45.     Prior to November 1, 2014, MCB only screened donors for genetic diseases by way of a complete blood count ("CBC") and other self-reporting questionnaires.  This protocol was ineffective in detecting all genetic diseases for which MCB agreed it would screen and warranted it found no evidence of.

46.     When MCB was purchased in 2014 by LPG, the genetic screening process for genetic diseases was changed.

47.     In approximately November of 2014, MCB switched to using a testing methodology called next-generation sequencing ("NGS").  NGS is known as high-throughput sequencing which is a catch-all term used to describe a number of different modern sequencing technologies including: Illumina (Solexa) sequencing; Roche 454 sequencing; Ion torrent: Proton / PGM sequencing; and SOLiD sequencing.[3]

48.     According to sworn testimony, MCB switched to NGS technology because it is more robust and more economical and tests for more traits and genetic diseases than MCB's prior screening protocol.

---

[3] https://www.ebi.ac.uk/training/online/course/ebi-next-generation-sequencing-practical-course/what-you-will-learn/what-next-generation-dna-

49. MCB's website indicates that MCB performs extensive genetic screening on donor sperm, and that sperm donated after November 1, 2014 is *always* tested for the following genetic diseases:[4]

> Genetic Testing Policy for New Donors on/after November 1, 2014 (All Donors):
> › Alpha-Thalassemia
> › Beta-Thalassemia
> › Bloom's Syndrome
> › Canavan Disease
> › Cystic Fibrosis
> › Dihydrolipoamide Dehydrogenase Def
> › Familial Dysautonomia
> › Familial Hyperinsulinism
> › Fanconi Anemia Group C
> › Gaucher Disease
> › Glycogen Storage Disease Type Ia
> › Joubert Syndrome 2
> › Maple Syrup Urine Disease Type IA/IB
> › Mucolipidosis
> › Neimann-Pick Disease Type A/B
> › Nemaline Myopathy
> › Sickle Cell Disease
> › Spinal Muscular Atrophy
> › Tay Sachs Disease
> › Usher Syndrome Type 1F
> › Usher Syndrome Type III
> › Walker-Warburg Syndrome

50. In contrast, prior to November 1, 2014, MCB's website indicated that it only tested for the following genetic diseases:[5]

> Genetic Testing Policy for Donors Donating Prior to November 1, 2014:
> › Cystic Fibrosis – 97 Mutation Analysis
> › Thalassemia
> › Sickle Cell Anemia (African American/ Mediterranean Donors)
> › Tay Sach's (Jewish/French Canadian Donors)

51. Although MCB knew that NGS technology provides a more robust screening, as acknowledged by its own website and its CEO Ty Kaliski in sworn testimony, MCB made the conscious decision not to screen the sperm in its inventory donated prior to November 1, 2014 with NGS technology. Instead, MCB chose to continue to offer sperm donated prior to November 1, 2014 for sale to the unsuspecting public without further screening until June 2018 when it merged with California Cryobank and became Defendant CCB-MCB, LLC. Thus, for more than three years, MCB's entire pre-November 1, 2014 inventory of sperm was not screened

---

[4] https://www.manhattancryobank.com/donor-sperm/donor-screening/ (last visited January 24, 2019).
[5] https://www.manhattancryobank.com/donor-sperm/donor-screening/

or re-screened using NGS technology in breach of its agreement with Plaintiffs and the putative class.

52.    Thus, MCB sold – and unsuspecting consumers received – sperm which may contain genetic defects.

53.    Moreover, for a period of years, MCB chose not to warn consumers who previously purchased sperm from inadequately screened donors who donated prior to November 1, 2014 of the risk that the sperm may contain genetic defects.

54.    MCB continued to sell pre-2014 donor sperm that was not properly screened for genetic diseases until June 2018.

55.    As of January 24, 2019, MCB's website reflects a substantial and unexplained gap in donor numbers that ranges from donor 323 to donor 4944, a gap of 4,621.

56.    Could this unexplained gap in donor numbers be related to donors who were previously accepted by MCB and their sperm was offered for sale to the public but subsequently rejected after the June 2018 screening with NGS technology?

57.    And how many consumers purchased sperm from donors 324 through 4943 who either do not know that those donors were subsequently rejected or who have unknowingly conceived children with genetic diseases?

**MCB's Own Principals Acknowledge the Inadequacies of its Prior Screening**

58.    In April 2017, MCB's then-CEO, Ty Kaliski, testified in a sworn deposition as follows:

a.    MCB began using GoodStart Genetics to do NGS screening in November 2014 but only for new donors:

```
11      Q.   When did you start using Good Start
12  Genetics?
13      A.   November 2014.
14      Q.   Shortly after you came on board?
15      A.   Uh-huh, which was only for new donors,
16  new and/or existing donors.  Not donors that are
17  old donors that are listed on the website.
18      Q.   Why is that?
19      A.   Excuse me?
20      Q.   Why is that?
21      A.   Because once you set a policy, the
22  policy is set from that point going forward,
23  never retroactive.
```

      b.      Kaliski further testified that NGS was a more robust methodology of screening for genetic defects or diseases:

```
 7      Q.   Did you feel like Good Start Genetics
 8  offered more robust testing with respect to
 9  genetic testing?
10      A.   Yes.
11      Q.   Why is that?
12      A.   They offer a methodology of testing
13  called NextGen Sequencing.
14      Q.   What is NextGen Sequencing?
15      A.   Best way that I can describe it is,
16  there's a methodology of genetic testing
17  where -- genetic testing, like, you're in a
18  room, you -- some genetic testing will come in
19  and try to find keys and a wallet in a room.
20  The NextGen Sequencing, basically you turn on
21  the light, you find the keys, you find the
22  wallet, you find crumbs, you know, that the
23  person ate last week, and all this other stuff.
```

      c.      As conceded by Kaliski, sperm from donors screened prior to November 2014 was not screened with NGS technology but continued to be sold by MCB:

6    Q.    Did you feel like it was better than
7  the testing that they were doing back in 2009?
8    **A.   Yes.**
9    Q.    Because it's more robust and it --
10  more economical, and it tests for more traits or
11  genetic diseases than sort of picking and
12  choosing various tests to perform?
13    **A.   That's correct.**
14    Q.    But you said you didn't do this same
15  testing for the donors in -- prior to the
16  November 2014 date that you switched over, true?
17    **A.   Uh-huh.  Yes.**
18    Q.    I'm sorry, did you -- are we finished?
19    **A.   No, I -- I'm having trouble saying yes**
20  **and no.**
21    Q.    So if you had a -- a customer that
22  comes in today and says, I want to buy some
23  sperm that's from -- January 2015 was donated,
24  presumably been through the NextGen Sequencing
25  testing, correct?

1    **A.   Yes.**
2    Q.    But if they want to buy the 2009 or
3  2010 donor sperm, it has not been through that
4  same testing, true?
5    **A.   No, it hasn't.**

    d.       When asked why customers were not entitled to have earlier donors rescreened with NGS technology, Kaliski testified that it was just MCB's policy:

6    Q.    Why doesn't that customer deserve the
7  same testing run on the sperm that was donated
8  prior to November 2014?
9        MR. TRIPODI:  Objection to the form of
10    the question.
11    Q.  You can answer.
12        MR. TRIPODI:  You can answer.
13    **A.   I -- what --**
14        MR. TRIPODI:  Want to repeat it?  Want
15    the question read back?
16    **A.   Sure.**
17        (The record was read back.)
18    **A.   There's no -- I mean, I don't have an**
19  **answer for that.  I mean, we set a policy.  The**
20  **policy is, it goes -- starts from one date going**
21  **forward.**

59.    MCB's acknowledgement of the shortcomings of its prior genetic screening does not end there.

60.    In June 2016, Anne Morris, the Chairman of the Board of MCB, co-authored a peer-reviewed article entitled, "*Carrier Screening Is a Deficient Strategy for Determining Sperm Donor Eligibility and Reducing Risk of Disease in Recipient Children*."[6]  According to the article co-authored by MCB's Chairman of the Board:

> Despite tremendous advances in variant identification, understanding, and analysis, the vast majority of disease-causing mutation combinations remain undetected by commercial carrier screening panels, which cover a narrow, and often distinct, subset of genes and mutations.  The biological reality is that all donors and recipients carry serious recessive disease mutations.[7]

61.    The article concluded that "[s]ystematic, high-resolution analysis of recessive disease risk associated with particular donor/recipient pairings has been developed, ***but industry practice must be modified to incorporate its use.***"[8]

62.    The peer-reviewed article and study further concluded "[a] donor bank's selection of screening provider, therefore, can drive very different outcomes in the determination of donor eligibility—and ultimately the exposure of recipient offspring to disease risk."[9]

63.    Simply stated, the study (co-authored by an MCB principal) concluded that NGS analysis is better able to detect genetic defects than the methodology used by MCB prior to November 1, 2014.

64.    Despite this peer-reviewed research study including the finding that modifications were required in the industry, co-author Anne Morris did nothing to ensure that all sperm offered

---

[6] See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4892196/ (last visited on January 23, 2019).
[7] See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4892196/ (last visited on January 23, 2019).
[8] See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4892196/ (last visited on January 23, 2019).
[9] See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4892196/ (last visited on January 23, 2019).

for sale by MCB, the cryobank of which she was the chairman of the board, was screened with the same technology that she held out as the industry standard.

### PLAINTIFFS' EXPERIENCE WITH MCB

65.    Donor 184 donated sperm at MCB in 2009.

66.    Plaintiffs paid several hundred dollars for Donor 184's sperm.

67.    Plaintiffs were subsequently inseminated with Donor 184's sperm provided by MCB.

68.    At the times of purchase and despite its warranties, MCB did not tell Plaintiffs that Donor 184 was not screened using NGS technology, the technology MCB knew to be more robust and recognized as the industry standard.

69.    Plaintiffs both gave birth to children conceived with Donor 184's sperm from MCB.

70.    Plaintiffs paid money to MCB for storing and transferring Donor 184's sperm from MCB.

71.    After Plaintiffs learned that Donor 184 was a carrier of the alpha thalassemia trait, Plaintiffs expended additional funds to have both of their children screened for thalassemia.

### MCB'S SLOPPY DONOR-SCREENING PRACTICES

72.    After MCB was notified by another consumer that purchased Donor 184's sperm that a child conceived with Donor 184's sperm was diagnosed with alpha thalassemia[10] (one of the genetic diseases for which MCB warranted it screened Donor 184 and found no evidence of such disease), MCB re-screened Donor 184 and found that he was, in fact, a carrier of the thalassemia trait.

---

[10] Alpha thalassemia disease, which causes a severe anemia that requires blood transfusions and may be lethal, occurs when 3 or 4 of these alpha globin genes are missing.

**Results Report**

Patient
MRN:
Gender:  Male
Ethnicity:  Caucasian

Specimen
Specimen Type:  Blood
Date Collected:  05/03/2016
Date Received:  05/04/2016

Physician
Name:  Aaron Spitz, MD
GSG Account: MC1101NX
Clinic Name:  Manhattan Cryobank

Clinical Indication for Testing:  Gamete donor

**REVIEWED**

**RESULTS SUMMARY**

This individual tested positive for the following disorder(s) and is therefore predicted to be at increased risk to have an affected child. Genetic counseling is recommended and testing of the reproductive partner may be warranted. See Clinical Summary for additional information.

**CARRIER: Alpha-Thalassemia (HBA1, HBA2)**
**Mutation: SEA**
Positive for a mutation that deletes two copies of the alpha-globin gene (αα/--).

See Clinical Summary and/or Reduced Risk Table for additional results and/or information.

73.    In 2015, MCB screened a total of 94 sperm donors for genetic diseases using NGS technology.

74.    Of the 94 sperm donors screened by MCB in 2015 with NGS technology:

a.    five were rejected because of abnormal results for alpha thalassemia;

b.    two were rejected for abnormal results for cystic fibrosis;

c.    one was rejected for abnormal results for Fanconi Anemia Group C;

d.    two were rejected for abnormal results for Spinal Muscular Atrophy ("SMA"); and

e.    three were rejected for abnormal results for Tay-Sachs disease (enzyme).

75.    As such, 13 of the 94 persons, roughly 13 percent, who donated sperm to MCB in 2015 were rejected for abnormal results for genetic diseases for which MCB warrants that it screens.

76.    Again, prior to June 2018, MCB chose not to screen any of the sperm donated prior to November 1, 2014 with NGS technology, yet MCB continued to offer such sperm for sale to the public without disclosing it had not been screened with NGS technology and could contain genetic defects.

77.    Based on the 2015 screening with NGS, simple arithmetic leads to the conclusion that approximately 13 percent of the sperm donated prior to November 1, 2014 likely contains genetic diseases for which MCB warranted that it screened and found no evidence thereof.

78.    In addition, after learning of that Donor 184's sperm from MCB was used to conceive a child with thalassemia, MCB's CEO pulled the paper files of MCB's donors that had already been approved for sale of their sperm to the unsuspecting public.

79.    MCB's CEO, Ty Kaliski, testified in an April 2017 deposition as follows:

Q.    Since learning of [the] incident in the -- in summer of 2016, has Manhattan Cryobank done anything differently to avoid a scenario like this in the future?

A.    Yes.

Q.    What is that?

A.    The donor audit.

Q.    Tell me how that works.

A.    I went through every single donor chart and pulled out inconsistencies.

Q.    So you went through all the current known donors that have files at MCB?

A.    All donors.

…

Q.    Out of the 125 to 130, how many did you find deficiencies roughly?

A.    I think maybe one or two.  Like -- less than five.

Q.    Any specific recollection of what those deficiencies were?

A.    One was a -- a donor who resided in a country that should not have -- that would --  that was in the -- or the -- the FDA rules and regulations as not being able to be donated.  Another one --

...

Q.    Other than the donor from Macedonia that shouldn't have been allowed to donate, what other deficiencies do you recall that you noticed in the audits that you performed after the []event?

A.  On other things that I found?

Q.  Yes.

**A.  Okay.  I found another issue similar to Donor 184.**

Q.  Okay.  What specifically was the issue with this other similar --

A.  Similar CBC.  And similar hemoglobin electrophoresis.

Q.  And he was presumably approved by Dr. Spitz?

A.  Yes.

Q.  Have any children, to your knowledge, been born with that donor sperm?

A.  Not to -- born?  Yes.  Born with the trait?  I don't know.

Q.  Yeah.  Okay.

A.  Nothing has been reported back.[11]

80.     Therefore, MCB's own CEO testified that despite his review of the physical donor files and finding that another donor should have been rejected, MCB did not reach out to consumers that purchased that donor's sperm to warn them of the risks.  Instead, MCB chose to stick its head in the sand, waited for families to contact it if their child was born with a genetic disease, and continued to sell potentially tainted sperm to the public.

81.     And MCB only took initiative to review the donor files after MCB learned that Donor 184's sperm was used to conceive a child born with thalassemia.

82.     Shockingly, after learning of other pre-November 2014 donors who may have genetic diseases or be carriers of such, for more than three years MCB did *nothing* to notify consumers who purchased pre-November 1, 2014 sperm of the fact that it had not been properly screened and that an internal audit had further identified approved donors who should have been rejected by MCB.

---

[11] Deposition of Ty Kaliski p. 84, l. 24 – p. 88, l. 14.

83.     There is no question that MCB was reckless in not implementing its genetic testing policy retroactively, which increased genetic risk for consumers who chose pre-November 1, 2014 donors and in failing to communicate the implications of those testing practices to its clients.

84.     From 2009 to 2016, Donor 184's sperm was in regular use.

85.     As more offspring were conceived with Donor 184's sperm, it became more and more likely that a child with alpha thalassemia would be conceived.  With time, as the number increased, it would become a virtual certainty that eventually such a child would be conceived. This is not an esoteric piece of information that MCB would not have known at that time.

86.     MCB knew that after November 1, 2014, it was routinely rejecting donor candidates with genetic diseases identified by NGS technology.

87.     MCB knew that its pre-November 1, 2014 inventory had not been screened with NGS technology.

88.     Nevertheless, MCB continued to sell the pre-November 1, 2014 sperm to the public without hesitation or warning.

## VI.    CLASS ACTION ALLEGATIONS

89.     This action is brought and may be properly maintained under Federal Rules of Civil Procedure 23(a) and (b)(2) and (b)(3).

90.     Plaintiffs bring this action as a class action on behalf of themselves and all other similarly situated as members of a Class identified as follows: *All persons who purchased sperm from Manhattan Cryobank, Inc. after November 1, 2014 but before June 5, 2018 that was donated to Manhattan Cryobank, Inc. prior to November 1, 2014.*

91.    Plaintiffs reserve the right to amend this class definition and, if deemed appropriate, to subdivide the Class into subclasses.

92.    Plaintiffs seek to recover on behalf of themselves and the Class members the monies they paid to Defendant MCB to: (a) purchase donor profiles and accompanying information, such as baby photos and voice recordings, (b) purchase donor sperm, (c) all transfer and storage fees for donor sperm that was donated prior to November 1, 2014, as well as all other costs Plaintiffs and Class members have incurred as a result of the potentially tainted sperm.

93.    Further, for themselves and the Class, Plaintiffs seek (a) a declaration that MCB breached its contractual obligations and warranties to them and Class members and (b) injunctive relief to ensure that the misconduct described herein finally ends, without the threat of it recurring in the future.

94.    **Numerosity**— FED. R. CIV. P. 23(a)(1): The members of the Class are so numerous and widely dispersed that joinder of them in one action is impracticable.  The precise number of Class members is unknown to Plaintiffs, but the Class likely numbers in the hundreds or thousands that are geographically dispersed throughout the United States since Defendants have been in the business of selling sperm to consumers across the United States since 2007. Each Class member should be readily identifiable from information and records in Defendants' possession and control.  Members of the Class may be notified of the pendency of this action by published, mailed, and/or electronic notice.

95.    **Existence of Common Questions of Law and Fact**—FED. R. CIV. P. 23(a)(2) and (b)(3): Common questions of law and fact exist as to Plaintiffs and all Class members and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

a.    Did MCB enter into the same Agreement for Purchase of Donor Sperm with every Class member;

b.    Did MCB agree and warrant that it performed a complete and thorough screening of the donor(s) for inheritable birth defects, inheritable serious illnesses that could be fatal, life threatening, or could result in permanent impairment of a body function or permanent damage to a body structure and for infectious diseases and, further, that it found no evidence of such inheritable birth defects, serious illness or infectious diseases in the donor(s) whose semen was purchased by Plaintiffs and the putative class;

c.    Did MCB breach the Agreement for Purchase of Donor Sperm;

d.    Did MCB adopt a new testing regime in November 2014;

e.    Did MCB choose not to use the new testing regime on sperm donated prior to November 1, 2014 until June 6, 2018; and

f.    After November 1, 2014, did MCB warn all Class members of the potentially tainted sperm donated before November 1, 2014.

96.    **Typicality**— FED. R. CIV. P. 23(a)(3): Plaintiffs' claims are typical of the claims of the Class, as Plaintiffs and Class members entered into a uniform contract with Defendants. Plaintiffs' claims are typical of the claims of all Class members because their claims arise from the same underlying facts and are based on the same factual and legal theories as the claims of all Class members. Plaintiffs are no different in any relevant respect from any other member of the Class.

97.    **Adequacy of Representation**— FED. R. CIV. P. 23(a)(4): Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent. Plaintiffs have retained competent and experienced class action

counsel who will vigorously prosecute this action. The Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

98. **Superiority**—A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the Class members is impracticable. Even if Plaintiffs and the other Class members could afford individual litigation, the courts could not. The amount at stake for each Class member is such that individual litigation would be inefficient and cost prohibitive. Additionally, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

99. This action is certifiable under the provisions of FED. R. CIV. P. 23(b)(2) and (b)(3) because:

a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendants;

b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of the other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c. Defendants have acted or refused to act on grounds generally applicable to the Class members, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class members and necessitating that any such relief be extended to the Class members on a mandatory, class-wide basis.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### BREACH OF CONTRACT

100.    Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

101.    Plaintiffs and the putative class all entered into an agreement with MCB in which MCB warranted and acknowledged as follows:

> *Manhattan Cryobank acknowledges that they have performed a complete and thorough screening of the donor(s) for inheritable birth defects, inheritable serious illnesses that could be fatal, life threatening, or could result in permanent impairment of a body function or permanent damage to a body structure and for infectious diseases and, further, that they have found no evidence of such inheritable birth defects, serious illness or infectious diseases in the donor(s) whose semen will be used in the Recipient's reproductive procedure.*

102.    Plaintiffs and the putative class all purchased donor semen as provided under the agreement.

103.    MCB breached the agreement, and Plaintiffs' and the putative class' damages resulted from MCB's breach.

### SECOND CLAIM FOR RELIEF
### BREACH OF EXPRESS WARRANTY

104.    Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

105.    MCB made the following express warranty to Plaintiffs and the putative class:

> *Manhattan Cryobank acknowledges that they have performed a complete and thorough screening of the donor(s) for inheritable birth defects, inheritable serious illnesses that could be fatal, life threatening, or could result in permanent impairment of a body function or permanent damage to a body structure and for infectious diseases and, further, that they have found no evidence of such inheritable birth defects, serious illness or infectious diseases in the donor(s) whose semen will be used in the Recipient's reproductive procedure.*

106.    The forgoing statement of fact was a material factor inducing Plaintiffs and the putative class to purchase the donor sperm from MCB.

107.    Plaintiffs and the putative class relied on MCB's express warranty which was objectively material to their decision to purchase sperm from MCB.

108.    MCB's breach of the express warranty caused economic damage to Plaintiffs and the putative class.

### THIRD CLAIM FOR RELIEF
#### UNJUST ENRICHMENT

109.    Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

110.    Defendants were enriched at the expense of Plaintiffs and the putative class as set forth above.

111.    It is against equity and good conscience to permit Defendants to retain what is sought to be recovered by Plaintiffs and the putative class.

### FOURTH CLAIM FOR RELIEF
#### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF UNDER 28 U.S.C. § 2201

112.    Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

113.    An actual controversy has arisen and now exists between Plaintiffs and the other Class members, on one hand, and Defendants on the other hand, concerning their respective rights and duties.  Plaintiffs and the other Class members contend that MCB failed to perform a complete and thorough screening of the pre-November 1, 2014 donors as warranted by MCB and failed to notify all consumers who purchased sperm after November 1, 2014, which was donated prior to November 1, 2014, that the sperm purchased may contain genetic defects for which MCB has warranted it found no evidence of.

114.    A judicial declaration is necessary and appropriate at this time, under the circumstances presented, in order that Plaintiffs and the putative class may ascertain whether the sperm they purchased contains genetic defects for which MCB previously represented it screened and found no evidence thereof.

115.    Further, Plaintiffs and the putative class seek to require Defendants to warn Class members that the pre-November 1, 2014 sperm was not screened with NGS technology and may contain genetic defects or diseases.   Plaintiffs and the putative class seek an injunction prohibiting Defendants from offering sperm for sale without warning that it has not been screened with NGS technology.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment on behalf of themselves and the proposed Class as follows:

a.    For an order certifying the Class herein under FED. R. CIV. P. 23(a)(b)(2) and (b)(3) and appointing Plaintiffs and their undersigned counsel to represent the proposed Class under FED. R. CIV. P. 23(g);

b.    For an order awarding actual and statutory damages and pre-judgment and post-judgment interest;

c.    For an order requiring Defendants to disgorge all amounts by which they have been unjustly enriched;

d.    For an order requiring Defendants to: (1) warn class members that the pre-November 1, 2014 sperm was not screened with NGS technology and may contain genetic defects or diseases; and (2) cease and desist from offering sperm for sale without warning that has not been screened with NGS technology;

e.    For an order awarding Plaintiffs and the Class members the reasonable costs and expenses of suit, including their attorneys' fees; and

f.    Award any further relief the Court may deem appropriate.

DATED: JULY 6, 2020                    RESPECTFULLY SUBMITTED,

                                       STECKLER GRESHAM COCHRAN PLLC

                                       /s/ Bruce Steckler
                                       Bruce Steckler
                                       Texas Bar No. 00785039
                                       New York Bar No.: 4863395
                                       L. Kirstine Rogers (*to be admitted PHV*)
                                       Texas Bar No. 24033009
                                       12720 Hillcrest Rd. Suite 1045
                                       Dallas, Texas 75230
                                       P: 972-387-4040
                                       F: 972-387-4041
                                       bruce@sgc.law
                                       krogers@sgc.law

                                       **ATTORNEYS FOR PLAINTIFFS**